UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL MOGAN, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CITY OF CHICAGO, a municipal ) <br> corporation, and ROSCOE VILLAGE LOFTS ) <br> CONDOMINIUM ASSOCIATION, a ) <br> corporation, ) <br> ) <br> Defendants. ) | No. 21 C 1846 <br><br> Judge Sara L. Ellis |

## OPINION AND ORDER

Plaintiff Michael Mogan brings this lawsuit because he wishes to list his condominium unit, 1800 West Roscoe Street Unit #307 in Chicago, Illinois (the "Unit"), for rent on "home sharing" websites like Airbnb. The Court dismissed Mogan's first amended complaint. Doc. 43. In his second amended complaint, Mogan brings three claims against the City of Chicago (the "City") and one claim against the homeowners' association of the Unit, Roscoe Village Lofts Condominium Association (the "Roscoe HOA"). Mogan first seeks a declaratory judgment against the City and the Roscoe HOA regarding his ability to lease and license the Unit on home sharing websites (Count I). He then brings two claims against the City challenging the constitutionality of the City's Shared Housing Ordinance (the "Ordinance"), which regulates the home sharing industry. Mogan alleges that the Ordinance constitutes an unconstitutional taking in violation of the Fifth Amendment of the U.S. Constitution (Count II) and an inverse condemnation under Illinois law (Count III). The City now moves to dismiss Mogan's second amended complaint.

Because Mogan again fails to sufficiently allege all three factors to support a regulatory takings claim, the Court dismisses his takings and inverse condemnation claims with prejudice. No claims against the City remain and therefore, no controversy exists between Mogan and the City. Thus, the Court dismisses Mogan's request for a declaratory judgment against the City with prejudice. Finally, the Court declines to exercise supplemental jurisdiction over his declaratory judgment request against the Roscoe HOA and dismisses it without prejudice.

## BACKGROUND[1]

Home sharing, when homeowners allow guests to stay in their home, often for a fee, is a long-standing American tradition that has recently increased in popularity due to home sharing websites like Airbnb. Airbnb acts as an intermediary between hosts and guests by facilitating the rental transaction through its website. Hosts create listings that contain information about their homes, including the suggested price per night, and about themselves. Airbnb displays these listings on its website for potential guests to browse. After guests choose a listing, they request to rent the home and can make offers at or below the suggested rental price. Once the host and guest agree on a price and rental period, Airbnb confirms the booking. To effectuate the transaction, the guests pay Airbnb and Airbnb pays the host. Hosts can rent their homes on Airbnb on a short-term or long-term basis.

### I.     The Ordinance

In response to the increased popularity of home sharing websites, the Chicago City Council passed the Ordinance in June 2016 to regulate the home sharing industry. The Ordinance took effect on or about December 19, 2016, and enforcement against non-compliant

---

[1] The Court takes the facts in the background section from Mogan's second amended complaint ("SAC") and presumes them to be true for the purpose of resolving the City's motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011) (Rule 12(b)(6)); *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (Rule 12(b)(1)). The Court "may also take judicial notice of matters of public record." *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1043–44 (7th Cir. 2019).

hosts began on March 15, 2017. The Ordinance regulates both "vacation rentals" and "shared housing units." It defines "vacation rentals" as "a dwelling unit that contains 6 or fewer sleeping rooms that are available for rent," excluding bed-and-breakfasts, hotels, "a dwelling unit for which a tenant has a month-to-month rental agreement and the rental payments are paid on a monthly basis," corporate housing, guest suites, and shared housing units. Municipal Code of Chicago ("MCC") § 4-6-300(a). The Ordinance defines "shared housing unit" as "a dwelling unit containing 6 or fewer sleeping rooms that is rented, or any portion therein is rented, for transient occupancy by guests," excluding "(1) single-room occupancy buildings; (2) hotels; (3) corporate housing; (4) bed-and-breakfast establishments; (5) guest suites; and (6) vacation rentals." MCC § 4-14-010.

The Ordinance allows a homeowners' association to notify the City that "no licensed vacation rentals or shared housing units are permitted to operate anywhere in such building." MCC § 4-13-260(a)(9). The City then deems units within these buildings as "ineligible for listing by a provider on a licensee's platform," MCC § 4-13-260(a)(9), and the units cannot receive licenses to operate as vacation rentals, MCC § 4-6-300(c)(7), be rented as vacation rentals, MCC § 4-6-300(h)(4), register as shared housing units, MCC § 4-14-030(a), or be rented as shared housing units, MCC § 4-14-050(i). The City must maintain a public prohibited buildings list that identifies "the address(es) of all buildings whose owner(s), including any applicable homeowners' association or board of directors, have notified the commissioner, pursuant to Section 4-13-260(a)(9), that no vacation rentals or shared housing units, in any combination, are permitted to operate anywhere in such building."[2] MCC § 4-13-270(c).

---

[2] The prohibited buildings list is available at: https://data.cityofchicago.org/Buildings/House-Share-Prohibited-Buildings-List/7bzs-jsyj/data (last visited August 30, 2022).

Once the City adds a building to the prohibited buildings list, it must notify, in writing, shared housing unit and vacation rental hosts within the building and intermediaries of the unit's ineligibility. MCC §§ 4-13-260(b), 4-14-030(b). The parties may then request a hearing before the commissioner to contest the unit's ineligibility, and, after such hearing, the parties can appeal the final determination. MCC §§ 4-13-260(b), 4-14-030(b). If a host rents a unit that is on the prohibited buildings list twenty-eight days after the City sent final notice of the unit's ineligibility, the host is subject to a $5,000 fine per day that the violation continues. MCC §§ 4-6-300(h)(4), 4-14-050(i). If a host fails to remove an ineligible listing from a platform fifteen days after receiving the final ineligibility determination from the City, the host is subject to a $2,500 to $5,000 fine per day that the violation continues. MCC §§ 4-6-300(h)(11), 4-14-060(g).

On September 9, 2020, the Chicago City Council passed several amendments to the Ordinance that added the following provisions: vacation rentals and shared housing units are now subject to a minimum rental period of ten consecutive hours, MCC §§ 4-6-300(g)(l), 4-14-050(e), which effectively bans single-night rentals, and the maximum occupancy of vacation rentals and shared housing units is now "one person per 125 feet of floor area" of the unit, MCC §§ 4-6-300(g)(5), 4-14-050(b). A host who violates either of these provisions is subject to a $1,500 to $3,000 fine per day that the violation continues. MCC §§ 4-6-300(k)(1), 4-14-090(a).

**II.      The Unit**

Mogan bought the Unit in September 2004 and began leasing it to various tenants in 2009. He "expended thousands of dollars to furnish [the Unit] . . . to generate licensing and leasing revenue," Doc. 46 ¶ 99, and his ability to rent the Unit on a short-term and long-term basis "was a major part of his decision to purchase" the Unit, *id.* ¶¶ 119, 121. Mogan "has in the past or plans to in the future" list the Unit on home sharing websites to license the Unit to guests

4

"on a nightly, weekly, monthly or annual basis," *id.* ¶¶ 100–02, 132, and use it as a vacation home, *id.* ¶ 140. Before the City amended the Ordinance in 2020, Mogan made the Unit available for lease or license to more than one person per 125 square feet of floor area of the Unit and "plans to [do so] in the future." *Id.* ¶ 103.

Property Solutions Chicago Inc. manages the building that houses the Unit, the Roscoe Village Lofts ("Roscoe"). Pamela Chianelli is the secretary and shareholder of Property Solutions Chicago Inc. According to the Roscoe HOA's Declarations (the "Declarations"), the Roscoe HOA exercises its authority through its board of directors. The Declarations state that "no Unit shall be leased, subleased or assigned for transient or hotel purposes, which are hereby defined as being for a period of less than thirty (30) days where hotel services normally furnished by a hotel (such as room service and maid service) are furnished." *Id.* ¶ 24. Mogan "has not in the past nor intends to in the future offer licensees, lessees, sublessees or assignees" of the Unit services normally furnished by a hotel. *Id.* ¶ 35. In August 2016, the Roscoe HOA board of directors and Chianelli sought inclusion of Roscoe on the City's prohibited buildings list and the City added the building to the list that same month. The Roscoe HOA did not hold a vote of its members prior to placing the building on the prohibited buildings list. Chianelli has accused Mogan of placing the Unit on Airbnb in violation of the Declarations and has threatened him with the possibility of the City fining him or the Roscoe HOA board taking adverse action against him for listing the Unit on Airbnb. At no time prior to Chianelli's threats did she or a Roscoe HOA board member inform Mogan that Roscoe was on the prohibited buildings list. Instead, "Chianelli and the 2016 [Roscoe] Board waited to inform [Mogan] that the Roscoe Village Lofts at 1800 W. Roscoe St. had been added to the City of Chicago's Prohibited Building List" until after the Shared Housing Ordinance took effect. *Id.* ¶¶ 93–94.

Renting the Unit on home sharing websites "can serve as a good source of supplemental income" for Mogan, *id.* ¶ 113, and "enhances the value" of the Unit, *id.* ¶ 120. Because the "[d]emand for short-term rentals in Roscoe Village is strong," a unit that can be used for short-term rentals "can be sold for more money, and be sold faster, than one that cannot be used for short-term rentals." *Id.* ¶ 125. As a result, the Unit is worth $270,000 but would be worth $400,000 if it could be rented on home sharing websites like Airbnb. *Id.* ¶ 130. Moreover, Mogan's inability to rent the Unit on a short-term basis has caused a "loss of current rental income and a loss of property value." *Id.* ¶¶ 123, 126. Since Roscoe was added to the prohibited buildings list, Mogan has lost "a significant amount of profits," which has caused him "grave financial damage" because he "counted on that income to pay for" the Unit, "and he is [now] barely able to afford it." *Id.* ¶ 126.

In the past, Mogan has rented the Unit for up to $1,600 per month on other websites for terms of one month, six months, or a year. *Id.* ¶ 127. The average monthly rental rate on Airbnb for a Roscoe Village unit similar to the Unit is $3,200. *Id.* ¶ 128. Mogan pleads that between December 2019 and January 2022, he lost $41,600 in profits because he could not list the Unit on online platforms like Airbnb. *Id.* Mogan calculated this number by subtracting $1,600 from $3,200, and multiplying the result by the number of months from December 2019 to January 2022. *Id.* Mogan also lost $8,600 ($1,600 per month) between June 2019 and December 2019. *Id.* ¶ 129. The average nightly price for a one-bedroom unit on a home-sharing intermediary like Airbnb is $113 per night. *Id.* ¶ 115. The average nightly rental rate in the Roscoe Village area is $120 per night. *Id.* ¶ 128. If allowed to use Airbnb, Mogan would pay off his mortgage principal balance in less than seven years, saving a significant amount of interest at 4.5%. *Id.* ¶ 143.

6

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The standard of review for a Rule 12(b)(1) motion to dismiss depends on whether the defendant raises a facial or factual challenge. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). If, as here, a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction—a facial challenge—the Court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences" in the plaintiff's favor. *Id.* "[W]hen evaluating a facial challenge to subject matter jurisdiction," the Court employs the *Twombly–Iqbal* "plausibility" standard, "which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Id.* at 174.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

ANALYSIS

On January 18, 2022, this Court dismissed Mogan's first amended complaint. Doc. 43. As relevant here, because Mogan failed to sufficiently allege the relevant takings factors, the Court dismissed his takings and inverse condemnation claims against the City without prejudice, and, because the Court had dismissed all of his other claims, it dismissed Mogan's declaratory judgment claim against the City without prejudice. The Court also declined to exercise supplemental jurisdiction over Mogan's declaratory judgment claim against the Roscoe HOA and dismissed that claim without prejudice. In his second amended complaint, Mogan again brings the takings and inverse condemnation claims against the City and the declaratory judgment claim against the City and the Roscoe HOA. The City again moves to dismiss.

I. **Takings (Count II) and Inverse Condemnation (Count III) Claims**

The City argues that the Court should dismiss Mogan's takings and inverse condemnation claims because he fails to sufficiently allege them in his amended complaint. The Fifth Amendment's takings clause (applicable against the states through the Fourteenth Amendment) provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. Similarly, the Illinois constitution provides that "[p]rivate property shall not be taken *or damaged* for public use without just compensation as provided by law." Ill. Const. 1970, art. I, § 15 (emphasis added). "Pursuant to this provision [of the Illinois constitution], when a governmental defendant takes *or damages* private property for public use without a condemnation proceeding, the property owner may sue the defendant, in what is known as an inverse condemnation suit, to recover just compensation for the property that has been taken or damaged." *Berry v. City of Chi.*, 2020 IL 124999, ¶ 40 (emphasis added). Since Mogan alleges a taking of his property, not damage to it, the claims follow the same analysis and

8

thus, the Court will consider the claims together as the parties did. *See Hampton v. Metro. Water Reclamation Dist. of Greater Chi.*, 2016 IL 119861, ¶¶ 13, 16 (holding that where a plaintiff alleges a taking of his property under the Illinois constitution, as opposed to damage to his property, courts may use the same framework as a Fifth Amendment takings claim to analyze the claim).

To state a takings claim, what the plaintiff alleges has been taken for public use must "be considered property for the purposes of the Takings Clause of the Fifth Amendment." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001 (1984). Considering the claims in their entirety, Mogan alleges that the Ordinance restricts the use of his property or prevents him from making a particular use of his property without just compensation, which can constitute a regulatory takings claim. *See Murr v. Wisconsin*, --- U.S. ----, 137 S. Ct. 1933, 1943 (2017) (noting that "when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found"). At issue then, is whether Mogan sufficiently alleges that the Ordinance constitutes a regulatory taking.[3] A regulatory taking is "a restriction on the use of property that [goes] 'too far.'" *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015) (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). In determining whether a regulatory taking has occurred, the Court considers "[1] the economic impact of the regulation, [2] its interference with reasonable investment-backed expectations, and [3] the character of the government action." *Id.*

The City first argues that, even if the additional facts pleaded in the SAC are taken as true, the Ordinance causes minimal economic impact because Mogan retains many economically

---

[3] Mogan asserts that his takings claim is a regulatory takings claim, *see* Doc. 57 at 3–4, and does not allege that the Ordinance deprives him of all economically beneficial use of the Unit or imposes a permanent physical invasion of the Unit. Thus, the Court need only analyze whether the Ordinance constitutes a regulatory taking.

viable uses of the Unit. Mogan responds that he has lost property value and profits because he cannot rent the Unit on home sharing websites. In examining this factor, the Court must "compare the value that has been taken from the property with the value that remains in the property." *Murr*, 137 S. Ct. at 1943. The SAC alleges that the fair market value of the Unit would be $400,000, rather than $270,000, if Mogan could rent the Unit on Airbnb. However, as the Court previously noted, "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Const. Laborers Pension Tr. for S. Cal.*, 508, U.S. 602, 645 (1993). Even the alleged substantial reduction in property value does not constitute a *severe* economic impact. *See, e.g.*, *Nekrilov v. City of Jersey City*, 528 F. Supp. 3d 252, 272 (D.N.J. 2021) (finding that a fifty to sixty-six percent reduction in property value was not a severe economic impact sufficient to amount to a taking).

In addition, when an owner possesses "a full 'bundle' of property rights, the destruction of one 'strand' in that bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus v. Allard*, 444 U.S. 51, 65–66 (1979); *see also Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1074 (7th Cir. 2013) (explaining, "it is inappropriate to consider only the loss due to prohibited uses, without also considering the many profitable uses to which the property could still be put" (citation omitted) (internal quotation marks omitted)). Here, as the Court previously noted, Mogan is still able to rent the Unit on a long-term basis, live in the Unit, use it as a second home, or sell it. Therefore, Mogan has not sufficiently alleged an economic impact substantial enough to constitute a taking. *See, e.g.*, *Bettendorf v. St. Croix Cnty.*, 631 F.3d 421, 425 (7th Cir. 2011) (finding plaintiff "retains full use of his property for agricultural and residential purposes," therefore "[t]he County's action does not render the property 'practically useless,' as the takings jurisprudence requires"); *Home Builders Ass'n of*

10

*Greater Chi. v. City of Chi.*, 213 F. Supp. 3d 1019, 1029–30 (N.D. Ill. 2016) (finding plaintiff failed to allege a sufficient economic impact by merely alleging that the regulation "will have *some* impact on the property value").

Mogan also argues that the Ordinance caused him to lose profits from short-term rentals. Specifically, the SAC alleges that Mogan lost $1,600 per month in rental income because he could not list the Unit on Airbnb, which amounts to over $50,000 from June 2019 to January 2022. Mogan presents several benchmarks for Roscoe Village rental prices in the SAC, including that one-bedroom Airbnb rentals are $113 per night,[4] Doc. 46 ¶ 115, or $120 per night, *id.* ¶ 128, and that Units like his list for $3,200 per month, *id.* He also alleges that he has rented the Unit for up to $1,600 per month on other websites for terms of one month, six months, or a year. *Id.* ¶ 127. Mogan does not allege that he would (or could) rent the Unit for a certain number of days per month, which makes his lost profits calculations speculative at best. But even if the Court accepts Mogan's alleged $1,600 per month (or over $50,000 total) in lost profits, loss of a more profitable use of the property does not constitute a taking. *Nekrilov*, 528 F Supp 3d at 274 ("A [t]akings claim requires more than an allegation that the plaintiff has carried on a particular kind of business at the property and can no longer do so, or can no longer do so at a profit."). Furthermore, "the profit measure of economic impact is a disfavored basis for finding a taking," *id.* at 273, because "[p]rediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform," *Andrus*, 444 U.S. at 66. Even accepting all Mogan's new allegations as true, the SAC still does not allege economic impact sufficient to show a taking.

---

[4] The Unit is a "wide open floor plan," *i.e.*, a studio, that contains a king and queen bed. Doc. 46 ¶ 128.

The City next argues that the SAC fails to sufficiently allege that Mogan had a reasonable expectation of renting the Unit on home sharing websites because he purchased the Unit before Airbnb existed and because the City regulated short-term rentals prior to the Ordinance at issue. Mogan responds by pointing out that prior to enactment of the Ordinance, he had taken steps towards renting the Unit on home sharing websites and had engaged in short-term renting on a limited basis. However, as the Court previously noted, the steps that Mogan took towards renting the Unit on a short-term basis, such as furnishing and painting the Unit, are not specific to renting the Unit on home sharing websites and the Ordinance does not interfere with his ability to rent the Unit in other ways.

Mogan also argues that the City created an explicit assurance that he would continue to be able to rent the Unit on a short-term basis because the City permitted short term rentals "for over 179 years" and online short-term rentals "until 2016 without any qualifications." Doc. 57 at 12. Mogan asserts that his reasonable expectation is supported by the explicit assurances made by the City, citing *Ruckelshaus v. Monsanto*. 467 U.S. 986 (1984). However, this case is distinguishable because in *Ruckelshaus*, a statutory provision required the EPA to keep certain information confidential for a period of years, which created an explicit assurance that the EPA would keep the company's information confidential. 467 F.3d at 1011. Here, no statute required the City to allow home-sharing website rentals for any period of time, let alone until Mogan bought and decided to rent his Unit. This case is not similar to the explicit assurances found to support plaintiff's reasonable expectations in *Ruckelshaus*.

Furthermore, prior to 2016, the City did regulate short-term rentals under the vacation rental ordinance. MCC §§ 4-6-300(b), (f), (g), (h) (May 9, 2012). The parties agree that "[l]and use and zoning have historically been extensively regulated." Doc. 57 at 4. Within such a highly

12

regulated arena, parties must temper their business investment expectations. *See Bos. Taxi Owners Ass'n, Inc. v. City of Bos.*, 84 F. Supp. 3d 72, 79 (D. Mass. 2015) (finding "any 'reasonable investment-backed expectations' held by plaintiffs in their medallions must be *significantly* tempered in light of the decades-long, highly regulated nature of the taxicab industry within the City" (emphasis in original)). Mogan could not reasonably expect that the City would fail to regulate or limit the short-term rental market. *See Nekrilov*, 528 F. Supp. 3d at 274–76 (explaining that there is no general right to governmental consistency and that an expectation is only reasonable if it takes into account the power that the state has to regulate in the public interest); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992) ("It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers."). Thus, the SAC fails to sufficiently allege that Mogan had a reasonable investment-backed expectation in renting the Unit on a short-term basis through home sharing websites like Airbnb. *See Goodpaster*, 736 F.3d at 1074 (finding that "[w]hile the smoking ban may interfere with some reasonable investment-based expectations, it does not do so to a degree significant enough to find a taking").

Finally, the Ordinance is merely a regulation that "adjusts the benefits and burdens of economic life to promote the common good." *Penn Cent. Transp. Co. v. City. of N.Y.*, 438 U.S. 104, 124 (1978). Mogan argues that the City enacted the Ordinance for the "improper purpose [of] favor[ing] the hotel industry." Doc 57. at 13. However, as the Court previously determined, the Ordinance regulates the home sharing industry with an intent to promote, "the health, safety, morals, or general welfare" of the City's residential neighborhoods. *Penn Cent.*, 438 U.S. at 125. This weighs against finding a taking. *Goodpaster*, 736 F.3d at 1074–75. Mogan states that the

13

regulation "has gone too far" and argues that the policies underlying the Ordinance are misguided. However, Mogan does not explain how the Ordinance "has gone too far." In fact, the Ordinance *allows and regulates* short-term rentals, while providing homeowners' associations with a mechanism to prevent short-term rentals within their own buildings: the situation alleged here. *See, e.g.*, MCC § 4-13-260(a)(9). As for Mogan's criticism of the City's motivations, the Court looks to the regulation's effect on his property, not its policy underpinnings. *Willow Way, LLC v. Vill. of Lyons, Ill.*, No. 1:20-CV-03046, 2022 WL 972291, at *3 (N.D. Ill. Mar. 31, 2022) ("The Supreme Court reasoned that whether a regulation effectuates a taking can only be answered by asking what burdens the regulation place on the *property*, not what public interests are served by the regulation." (emphasis in original)).[5]

---

[5] Mogan also argues that "the City's operational, licensing and permit requirements are unduly burdensome under the unconstitutional conditions doctrine" because "they shift the entire burden identified by local communities as justifications for short-term rental restrictions to [Mogan] as an individual property owner." Doc. 57 at 11–12. Under the unconstitutional conditions doctrine, "a unit of government may not condition the approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a 'nexus' and 'rough proportionality' between the government's demand and the effects of the proposed land use." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 599 (2013). The SAC does not allege that the City conditioned short-term rental approvals on any sort of property right relinquishment, and the Court will not consider this underdeveloped argument further.

Because Mogan has again failed to sufficiently establish the factors for a regulatory taking, the Court concludes that further amendment would be futile and dismisses his Fifth Amendment takings claim and Illinois inverse condemnation claims with prejudice. *See Stanard v. Nygren*, 658 F.3d 792, 801 (7th Cir. 2011) ("Leave to replead need not be allowed in cases of 'repeated failure to cure deficiencies by amendments previously allowed.'" (citation omitted)); *Anderson v. Deutsche Bank Nat'l Tr. Co.*, No. 14 C 5474, 2014 WL 6806891, at *2 (collecting cases).

## II. Declaratory Judgment (Count I)

Finally, Count I of the SAC seeks a declaration that the City has a duty to allow Mogan to rent the Unit on home sharing websites. The City argues that because Mogan's constitutional claims against the City fail, no remaining controversy between the parties exists and therefore, the Court must dismiss Count I against the City. In addition, the City contends that the real controversy lies between Mogan and the Roscoe HOA. Mogan responds by asserting that because the City added Roscoe to the prohibited buildings list, a controversy exists between them. However, as the Court previously determined, Mogan's constitutional claims against the City fail. Thus, no controversy remains between Mogan and the City and the Court lacks jurisdiction over Count I against the City and dismisses it with prejudice. *See White v. Ill. State Police*, 15 F.4th 801, 807 (7th Cir. 2021) ("Article III limits the jurisdiction of federal courts to 'Cases' or 'Controversies.'" (citation omitted)); *Deveraux v. City of Chi.*, 14 F.3d 328, 330 (7th Cir. 1994) ("[T]he Declaratory Judgment Act 'expands the scope of available remedies' and permits persons 'to seek a declaration of the constitutionality of the disputed government action.' It is also true, however, that courts may not exercise this discretionary power in the absence of an 'actual controversy' between the parties." (citations omitted)).

As for Mogan's request for a declaratory judgment against the Roscoe HOA, the federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), does not provide the Court with an independent basis of jurisdiction. *Manley v. Law*, 889 F.3d 885, 893 (7th Cir. 2018). And Mogan has not alleged any such independent federal basis for his request for a declaratory judgment against the Roscoe HOA, nor has he pleaded that diversity jurisdiction exists. Therefore, no basis for original jurisdiction over the claim exists. And because the Court has dismissed Mogan's claims against the City, the Court finds it appropriate to decline to exercise supplemental jurisdiction over his declaratory judgment claim against the Roscoe HOA. *See* 28 U.S.C. § 1367(c) (district court may decline to exercise supplemental jurisdiction over state law claims when it has dismissed all claims over which it had original jurisdiction); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). Therefore, the Court also dismisses Count I against the Roscoe HOA without prejudice for refiling in state court.

## CONCLUSION

For the foregoing reasons, the Court grants the City's [53] motion to dismiss. The Court dismisses with prejudice Mogan's claim for a declaratory judgment against the City (Count I), takings claim (Count II), and inverse condemnation claim (Count III). The Court dismisses without prejudice Mogan's claim for a declaratory judgment against the Roscoe HOA (Count I). Civil case terminated.

Dated: September 12, 2022

SARA L. ELLIS
United States District Judge